UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA PAWNBROKERS ASSOCIATION, INC., a California Non-Profit Corporation, on behalf of itself and its members,<br><br>               Plaintiff,<br><br>     v.<br><br>ASHTON B. CARTER, in his official capacity as Secretary of Defense; and THE UNITED STATES DEPARTMENT OF DEFENSE,<br><br>               Defendants. | No.  2:16-cv-02141-JAM-KJN<br><br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

     This matter is before the Court on California Pawnbrokers Association's ("Plaintiff") Motion for Preliminary Injunction against Ashton B. Carter and the United States Department of Defense (collectively "Defendants").  A hearing on this Motion took place on November 1, 2016.  For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction is denied.

///

///

1

1          I.   FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

2          The Department of Defense ("Department") is responsible for

3     promulgating regulations to implement the Military Lending Act

4     ("MLA").   The purpose of the MLA is to protect members of the

5     military and their dependents from the financial pitfalls related

6     to consumer credit and ensure military readiness.   See Memorandum

7     Opinion, Huntco Pawn Holdings, LLC v. U.S. Department of Defense,

8     Civil Action No. 16-cv-1433 (CKK) (D.D.C. Oct. 3, 2016) at 3

9     ("Huntco").   The MLA achieves this by limiting the interest-rates

10    that lenders can impose on loans and requiring lenders to fulfill

11    certain other terms and conditions when extending credit to

12    covered borrowers.   See Limitations on Terms of Consumer Credit

13    Extended to Service Members and Dependents, 80 Fed. Reg. 43560,

14    43560 (Jul. 22, 2015) (to be codified at 32 C.F.R. pt. 232)

15    ("2015 Rule").   Prior to 2015, the Department limited the

16    definition of consumer credit to payday loans, vehicle title

17    loans, and refund anticipation loans.   Opp. at 3.   The Department

18    also created a safe harbor by which creditors could avoid the

19    MLA's restrictions and penalties if they obtained a disclosure

20    statement from the applicant stating that the applicant was not a

21    covered borrower ("self-certification").   Id.   Use of the self-

22    certification was entirely optional and creditors were free to

23    use other means to determine whether an applicant would be

24    covered under the MLA, though other means would not qualify for

25    the safe harbor.   Id.

26         In 2015, after notice-and-comment rulemaking, the Department

27    changed its regulations, expanding the definition of consumer

28    credit and changing the terms of the safe harbor provision.   2015

1   Rule, 80 Fed. Reg. 43560.  "Consumer credit" now includes all
2   credit currently "subject to the disclosure requirements of the
3   Truth in Lending Act [("TILA")], codified in Regulation Z."  Id.;
4   32 C.F.R. § 232.3(f)(1).  With this expansion, the MLA, for the
5   first time, covers pawn transactions.  Mot. at 4; see Truth in
6   Lending, 61 Fed. Reg. 14952 (Apr. 4, 1996) (to be codified at 12
7   C.F.R. § 226) (amending official staff interpretation to include
8   pawn transactions).  The new safe harbor "permits a creditor to
9   legally conclusively determine whether a consumer is a covered
10  borrower by using information obtained either: (i) Directly or
11  indirectly from the MLA Database or (ii) in a consumer report
12  from a nationwide consumer reporting agency or a reseller who
13  provides such a consumer report."  2015 Rule, 80 Fed. Reg. 43560,
14  43577; 32 C.F.R. § 232.5(b).  "A search of the Department's
15  database requires the entry of the consumer's last name, date of
16  birth, and Social Security number."  32 C.F.R.
17  § 232.5(b)(2)(i)(A).

18      CAPA filed the present suit seeking to stay and ultimately
19  enjoin enforcement of the sections of the 2015 Rule that include
20  pawn transactions and pawnbrokers in their definitions of
21  consumer credit and creditor.  Mot. at 1.  Alternatively, CAPA
22  seeks to stay the new safe harbor provision and restore the
23  borrowers' self-certification from the prior rule.  Id.  CAPA
24  filed an Ex Parte Application for Temporary Restraining Order on
25  September 16, 2016, to stop the 2015 Rule from going into effect
26  on October 3rd.  ECF No. 11.  This Court denied the Ex Parte
27  Motion and set the matter for hearing to determine whether the
28  Court should issue a preliminary injunction.  ECF No. 15.  On

1   October 12, 2016, the District Court for the District of Columbia

2   made a final ruling on the merits in Huntco, a case raising

3   similar challenges to the 2015 Rule.  See Order Granting Joint

4   Motion to Convert Opinion and Order into Final Judgment, Huntco

5   Pawn Holdings, LLC v. U.S. Department of Defense, Civil Action

6   No. 16-cv-1433 (CKK) (D.D.C. Oct. 3, 2016).  This Court ordered

7   supplemental briefing with respect to Defendants' Motion to

8   Change Venue (not at issue here) and the preclusive effect, if

9   any, of the Huntco decision on this matter.[1]  ECF 21.

10

11                          II.   OPINION

12       A.   Legal Standard

13       A preliminary injunction is "an extraordinary remedy that

14  may only be awarded upon a clear showing that the plaintiff is

15  entitled to such relief."  Winter v. Natural Resources Defense

16  Counsel, Inc., 555 U.S. 7, 22 (2008).  To obtain a preliminary

17  injunction, a plaintiff must demonstrate that: (1) it is likely

18  to succeed on the merits, (2) it is likely to suffer irreparable

19  harm in the absence of preliminary relief, (3) the balance of

20  equities tips in its favor, and (4) an injunction is in the

21  public interest.  Boardman v. Pacific Seafood Grp., 822 F.3d

22  1011, 1020 (9th Cir. 2016) (quoting Winter, 555 U.S. at 20).

23       B.   Analysis

24       Applying the Winter factors to the present matter, the Court

25  finds that CAPA has not shown it is likely to succeed on the

26  merits or that it is likely to suffer irreparable harm.  Given

27  _____

28  [1] The Court and the parties lack sufficient information about the
    parties to determine res judicata at this time.

1  that these conclusions warrant denial of Plaintiff's motion, the

2  Court need not and will not also address the balance of the

3  equities and public interest factors.

1.   Likelihood of Success On the Merits

CAPA's Complaint contains four separate counts each of which
CAPA argues is likely to succeed on the merits.  Mot. at 17–18.

a.   CAPA Is Not Likely to Succeed On the
     Merits of Count 1

Under Count 1, CAPA claims that the 2015 Rule's "inclusion
of non-resource pawn loans within the scope of the MLA is
arbitrary, capricious and an abuse of discretion not in
accordance with law."  Compl. at 19.

Preliminarily the Court finds that CAPA may challenge the
2015 Rule based on the inclusion of pawn transactions because
other pawnbrokers groups raised the issue during the notice-and-
comment rulemaking process.  See Natural Resources Defense
Council, Inc. v. U.S. EPA, 824 F.2d 1146, 1151 (D.C. Cir. 1987)
("This court has excused the exhaustion requirements for a
particular issue when the agency has in fact considered the
issue."); 2015 Rule, 80 Fed. Reg. 43560, 43562.

As for judicial review of agency action, federal courts
first ask whether Congress has directly spoken to the precise
question at issue.  Providence Yakima Med. Ctr. v. Sebelius, 611
F.3d 1181, 1189 (9th Cir. 2010) (quoting Chevron, U.S.A., Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837, 842
(1984)).  "[I]f the statute is silent or ambiguous with respect
to the specific issue, the question for the court is whether the
agency's answer is based on a permissible construction of the

5

statute." <u>Chevron</u>, 467 U.S. at 843.  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." <u>Id.</u> at 843-44.  The Ninth Circuit has further explained:

> An arbitrary and capricious challenge requires us to adhere to a narrow scope of review, wherein we are not to substitute our judgment for that of the agency.  The agency, however, is required to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made and we in turn must review that explanation, considering whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  A rule is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Providence Yakima Med. Ctr.</u>, 611 F.3d at 1190 (internal citations and quotation marks omitted).

Congress delegated the authority to promulgate regulations to effectuate the Military Lending Act to the Department of Defense.  <u>See</u> 2015 Rule, 80 Fed. Reg. 43560, 43567.  This authority includes the authority to define "consumer credit" and therefore the MLA's application to different lenders.  <u>See</u> 10 U.S.C. § 987(i)(6).

CAPA argues that the inclusion of nonrecourse pawn loans within the scope of the MLA is arbitrary and capricious.  CAPA points out that the 2015 Rule "includes nonrecourse pawn

1    transactions within the scope of the MLA even though payment is

2    not 'deferred.'"  Mot. at 9 (citing 32 C.F.R. § 232.3(f)(1)).

3    The same 2015 Rule defines "credit" as "the right granted to a

4    consumer by a creditor to defer payment of debt or to incur debt

5    and defer its payment." Id. (citing 32 C.F.R. § 232.3(h)).  CAPA

6    claims that redemption and payment of a pawn loan is optional and

7    there is no cognizable "debt" assignable to the pledger.  Id.  It

8    further argues that the 2015 Rule does not provide "any logical

9    reasoning articulating how pawn transactions are 'predatory'" or

10   "why pawn transactions are now included under the definition of

11   'consumer credit.'"  Id.  CAPA argues that the Department failed

12   to review relevant data and provide any explanation for the

13   application of the 2015 Rule to pawn transactions.  Id.  Further,

14   CAPA points out that Congress passed the MLA in response to a

15   Department report on predatory lending practices and pawn

16   transactions were not included in that report; only a few

17   practices were identified and the first Rule promulgated by the

18   Department to enforce the MLA only addressed those identified

19   practices.  Id. at 8-9.

20       Defendants argue that the Department "reasonably explained

21   its decision to expand the MLA protections to include any credit

22   transaction subject to the requirements of the TILA regulation,

23   including pawn loans, and to exclude only those types of credit

24   transactions exempted by Congress itself in the MLA."  Opp. at 9.

25   Even if the Department did not include a specific explanation as

26   to why pawn loans would be covered under the 2015 Rule,

27   Defendants argue that the Department addressed the pawnbrokers'

28   request "as part of its broader discussion to reject any

7

1    exceptions not required by statute." Id. (citing 2015 Rule, 80

2    Fed. Reg. 43560, 43561-62, 43568-69). The 2015 Rule explicitly

3    acknowledged the pawnbrokers' request for exemption and thus the

4    Departments' broad discussion of its reasoning applied to that

5    request. Id.

6        Judge Kollar-Kotelly evaluated a claim substantially similar

7    to CAPA's in Huntco and found that the Huntco plaintiffs were not

8    likely to succeed on the merits of the claim. Huntco at 19-20.

9    In that case, plaintiffs Huntco Pawnholdings, LLC, and the

10   National Pawnbrokers Association ("NPA") argued, *inter alia*, that

11   the 2015 Rule is arbitrary and capricious. Huntco at 15. Even

12   though that decision is not binding on this Court, Judge Kollar-

13   Kotelly's reasoning provides guidance to the Court on this issue.

14       The analysis in Huntco tracks Defendants' arguments in the

15   present case. Judge Kollar-Kotelly recognized:

16       The Department expressly noted that pawnbrokers were
         among the commenters requesting exemptions, stating
17       that "pawnbrokers and their representatives explain
         that traditional pawn transactions are different in
18       kind from other types of credit transactions,
         principally because a pawn transaction typically is a
19       non-recourse loan, and should be exempt from the scope
         of 'consumer credit' regulated under the MLA."
20

21   Huntco at 17; 2015 Rule, 80 Fed. Reg. 43560, 43562. The court

22   held that the "Department's failure to specifically discuss its

23   rationale for denying pawn loans a special exemption from the

24   Final Rule does not render the rule arbitrary or capricious."

25   Id. at 16. It found that the Department "discussed" the

26   comments from financial institutions requesting exemptions,

27   including pawnbrokers, "as a group," id. at 17, and accepted the

28   Department's response to those exemptions as a "reasoned

1    explanation," id. at 18.   The Huntco court pointed out that the

2    Department particularly took note of the comment submitted by

3    U.S. Senators "that urged the Department to widely expand the

4    definition of 'consumer credit' to close the 'existing MLA

5    loopholes'" and "asserted that creditors were able to evade the

6    law by crafting loans that fell just barely outside the

7    parameters of the definition of 'consumer credit.'"   Id.   Noting

8    the Department's reasoning that "all 'high cost loans' pose some

9    'risks to covered borrowers,'" the Huntco court concluded that

10   "[t]his rationale applies with full force to pawn loans, which,

11   despite the NPA's attempt to distinguish them in numerous ways

12   from other types of harmful lending, are indisputably 'high

13   cost.'"   Id. at 18-19.   It found the Department's general

14   response in the 2015 Rule adequate to address the pawnbrokers'

15   exemption request and stated that "Plaintiffs cite[d] no

16   authority requiring the Department to separately address each and

17   every exemption requested, especially where approximately fifty

18   such requests were made."   Id. at 19.

19        The 2015 Rule provides a lengthy explanation of the

20   Department's purpose and justification for expanding the scope of

21   the regulation.   Based on comments submitted on the Proposed

22   Rule, its consultations with a number of other federal agencies,

23   and "its experience administering the existing regulation for

24   over seven years," the Department decided to broaden the

25   regulation to cover credit that is already subject to the Truth

26   in Lending Act.   2015 Rule, 80 Fed. Reg. 43560, 43560.   The

27   Department "believes that this final rule is appropriate in order

28   to address a wider range of credit products[.]"   Id.   The

1   Department cited to hundreds of comments, the majority of which

2   expressed support for the new Rule, including support from a

3   number of U.S. Senators and Attorneys General.   Id. at 43561-62.

4   It further stated that over 350 groups, trade associations, and

5   business submitted comments, many of which expressed concerns or

6   opposition to the new Rule.   Id.   "Most financial institutions,

7   through approximately 50 comments, urge[d] the [Department] to

8   adopt in the final rule an exemption for certain types of

9   creditors or, more narrowly, one or more exemptions for certain

10  types of credit products."   Id. at 43561.   After describing some

11  of these specific requests, the Department noted the specific

12  exemption requested by pawnbrokers.   Id. at 43562.

13       As background, the Department explained that "the narrowly

14  defined parameters of the credit products regulated as 'consumer

15  credit' under the [previous] rule [did] not effectively provide

16  the protections intended to be afforded to Service members and

17  their families under the MLA."   Id. at 43563.   Particularly, the

18  Department discussed the "need to address risks posed by high

19  cost consumer credit" and rejected the position that the enabling

20  statute is intended solely to address so-called "predatory" loan

21  products:

            Even though the Department's initial proposal, issued
22          in April 2007, referred to various studies and reports
            (including reports and other initiatives by the
23          Department) that describe 'predatory' lending
            'practices,' the Department broadly described its
24          overarching aim, namely, to promote readiness by taking
            steps to reduce the risk that a Service member or his
25          or her family could get caught in a 'debt trap.' . . .
            When implementing the regulation in 2007, the
26          Department acted in light of the short timetable for
            the effective date of 10 U.S.C. 987 and the instruction
27          to act swiftly[.] . . .  Still, the Department elected
            to act judiciously by initially regulating only certain
28

                                   10

1
2
3
4
5
6
7
8
9

credit products that, at that time, the Department
believed posed the most severe risks to Service members
and their families. . . .  As the Department explained
when issuing the Proposed Rule, 'a broader range of
closed-end and open-end credit products carry high
costs, many of which far exceed the interest rate limit
established in 10 U.S.C. 987(b), and thereby pose risks
to Service members and their families.'  The Department
believes, and comments amply support the view, that the
scope of consumer credit reasonably could apply to
credit products that are subject to the requirements of
Regulation Z in order to reduce the risks to covered
borrowers posed by high-cost loans, and still preserve
access to a wide range of products, including 'much
needed, good, small-dollar credit options,' for those
borrowers.

10  Id. at 43566-68.  The Department went on to specifically discuss

11  why it chose not to create an exemption for an insured depository

12  institution or insured credit union and then also explained its

13  reasons for creating conditional exclusions for credit card

14  accounts.  Id. at 43568.  It did not specifically explain its

15  reasoning for including pawn transactions in the 2015 Rule, but

16  neither did it explain its basis for including every other

17  creditor or credit device that the 2015 Rule ultimately swept

18  into its coverage.

19      The Department has provided an adequate explanation of its

20  reasons for expanding the definition of the rule.  The Department

21  specifically acknowledged that pawnbrokers were one of the many

22  affected creditors that requested an exemption and provided a

23  rationale—though general—explanation for why it chose to expand

24  the regulation to the extent that it did.  This decision does not

25  appear arbitrary or capricious and CAPA is not likely to succeed

26  on the merits of this claim.

27

28          b.   CAPA Is Not Likely to Succeed On the
                 Merits of Count 2

                            11

1

2      Under Count 2, CAPA claims that the 2015 Rule violates equal

3  protection and is thus unconstitutional.  Compl. at 22.  CAPA

4  argues that the 2015 Rule impacts California pawnbrokers

5  differently than it does pawnbrokers elsewhere because California

6  pawnbrokers are subject to the California Unruh Civil Rights Act

7  ("Unruh Act").  Mot. at 11 (citing Cal. Civ. Code §§ 51(b),

8  51.5(a)).  Under the Unruh Act, one who denies or discriminates

9  against a consumer based on that consumer's immigration status

10  may be subject to a fine of $4,000 or more.  Mot. at 11–12

11  (citing Cal. Civ. Code § 52(a)).  CAPA argues that the Unruh Act

12  will prevent California pawnbrokers from being able to utilize

13  the 2015 Rule's safe harbor provision without facing liability,

14  thus denying them equal protection of the law.  Id. at 10–12.

15  CAPA acknowledges that if the safe harbor is mandatory, it

16  preempts state law.  Rep. at 5; 10 U.S.C. § 987(d).  CAPA argues

17  that it is precisely due to the fact that the safe harbor is

18  "optional" that it violates their constitutional rights because

19  CAPA members cannot avail themselves of the safe harbor's

20  protection without violating the Unruh Act.  Id.

21      Defendants argue that CAPA's equal protection claim fails

22  because nothing in the 2015 Rule prohibits the extension of

23  credit to individuals who lack a SSN.  Opp. at 13.  Building on

24  this point, they argue that the alleged injury to CAPA's members

25  follows from California state law, not the 2015 Rule.  Id. at 13–

26  14.  Further, even if CAPA has an equal protection claim,

27  Defendants argue the 2015 Rule would survive rational basis

28  review.  Id. at 14.

1    Although the Court acknowledges that CAPA members face a bit

2    of a Morton's Fork,[2] CAPA's equal protection theory is not likely

3    to succeed.  An equal protection claim typically arises where the

4    government makes a distinction between groups that burdens some

5    but not others.  See, e.g., Williamson v. Lee Optical of Okla.

6    Inc., 348 U.S. 483 (1955).  The 2015 Rule does not distinguish

7    between lenders in different states or single out lenders in

8    California in particular.  The Rule applies to all covered

9    creditors all over the United States.  CAPA's argument rests on

10   the premise that a rule that applies to creditors across the

11   nation but impacts pawnbrokers in California in a different way

12   violates equal protection.  Although disparate impact may trigger

13   a heightened standard of review in discrimination cases, Cf.,

14   Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

15   252 (1977), CAPA has failed to provide this Court with any

16   jurisprudence or special facts that supports their theory.

17   Furthermore, CAPA members are still able to minimize their risk

18   of liability by continuing to use a self-certification or other

19   method to verify covered borrower status.  See 32 C.F.R.

20   § 232.5(a).  While they may choose not to use the legally

21   conclusive safe harbor due to fear of liability under California

22   law, they are still authorized to use other means of verification

23   to all but ensure compliance with the MLA.

24

25   Even if the 2015 Rule does raise equal protection concerns,

26

27   [2] Moore v. Czerniak, 574 F.3d 1092, 1166 (9th Cir. 2009)
     (Callahan, J., dissenting) ("'Morton's Fork'-a choice between two
28   equally unpleasant alternatives.").

1   the parties agree that rational basis is the appropriate standard

2   of review.   Rational basis is a highly deferential standard: "The

3   burden [on the challenger] is to negative every conceivable basis

4   which might support [the law] whether or not the basis has a

5   foundation in the record."   <u>Golinski v. U.S. Office of Pers.</u>

6   <u>Mgmt.</u>, 824 F. Supp.2d 968, 995 (N.D. Cal. 2012) (citations and

7   quotation marks omitted).   The Department offered a lengthy

8   explanation for its decision to promulgate the new safe harbor

9   provision and move away from the self-certification procedure.

10  2015 Rule, 80 Fed. Reg. 43560, 43576–77.   This explanation

11  withstands rational basis review.

12              c.   <u>CAPA Is Not Likely to Succeed On the</u>
                    <u>Merits of Count 3</u>
13

14       Under Count 3, CAPA claims that the safe harbor provision of

15  the 2015 Rule contravenes Section 7 of The Privacy Act of 1974.

16  Compl. at 24.   Section 7 of that Act states: "It shall be

17  unlawful for any Federal, State or Local Government Agency to

18  deny to any individual any right, benefit, or privilege provided

19  by law because of such individual's refusal to disclose his

20  social security account number."   5 U.S.C. § 552a note.   The

21  Section does not apply to disclosures required by federal

22  statute.   <u>Id.</u>  CAPA argues that this Section applies to

23  pawnbrokers because under the 2015 Rule pawnbrokers are

24  "deputized" as government agents when they obtain SSNs from their

25  customers.   Mot. at 12-13.   Because, CAPA argues, SSN collection

26  is essentially mandatory due to the safe harbor provision, there

27  is a close nexus or impetus for collection that stems from the

28  regulation.   As such, CAPA claims that the safe harbor violates

1 the Privacy Act and must be declared void.  Id. at 13–16.

2       Defendants argue that the Privacy Act applies to government

3 agencies, not private businesses.  Opp. at 15.  They reiterate

4 that collection of SSNs is not compelled and that pawnbrokers are

5 free to reduce their risk of liability via the safe harbor or

6 choose not to do so.  Id. at 12–13.  Turning to the cases CAPA's

7 theory of deputization is premised on, Defendants argue that any

8 perceived obligation on the part of the pawnbrokers to collect

9 SSNs does not give rise to the type of government commandeering

10 of private entities that has only been found in extreme

11 situations.  Id. at 15.

12       The Department went to great lengths in the 2015 Rule to

13 explain that use of the safe harbor, and collection of SSNs, is

14 not mandatory.  2015 Rule, 80 Fed. Reg. 43560, 43576.  It pointed

15 out that nothing in the MLA "mandates the provision of any safe

16 harbor for a covered borrower check."  Id.  Rather, the

17 Department has chosen to provide a safe harbor on its own

18 volition.  Use of the provision is optional and the 2015 Rule

19 does not prescribe a method for a covered borrower check: "A

20 creditor is permitted to apply its own method to assess whether a

21 consumer is a covered borrower."  32 C.F.R. § 232.5(a).

22       CAPA cites two district court cases to support its argument.

23 First, in Joliet Oil Corp. v. Brown, 55 F. Supp. 876 (N.D. Ill.

24 1943), gasoline dealers were found to be agents of the government

25 where they were required to follow orders of the president during

26 the president's wartime rationing program.  Second, in Yeager v.

27 Hackensack, 615 F. Supp. 1087 (D. N.J. 1985), a private water

28 company's collection of SSNs from customers during a drought

emergency was imputed to the state for Privacy Act purposes.  In that case, after declaring a drought emergency, the Governor ordered certain government agents to take whatever steps were necessary to alleviate the emergency.  Id. at 1088.  The relevant Administrative Order delegated primary monitoring and threshold enforcement function to individual water purveyors and local governments, permitting the purveyor to require names of individuals in residential units and directing those purveyors to provide appropriate officials with information needed to carry out enforcement actions.  Id. at 1089.  Defendant, a purveyor, sent out postcards seeking the names of individual household members and SSNs.  Id.  Even though the Administrative Order did not specifically authorize collection of SSNs, the postcards indicated that a failure to provide such information could result in sanction.  Id.  The Yeager court concluded: "In short, [defendant] was authorized by the state to take whatever action it deemed necessary, including the collection of its customers' social security numbers, to enforce the state's water rationing program. Sufficiently onerous punitive measures were threatened to insure compliance with [defendant's] requests for information."  Id. at 1089-90.  Citing to Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974), the court reasoned that "in certain situations, where there is a close nexus between the state and an action by a regulated entity, the action of the latter may be fairly treated as that of the state itself" and held that the defendant's action would be imputed to the state. Id. at 1091.

     CAPA has not shown that its members face an analogous

16

1    situation.  The availability of an optional safe harbor provision

2    in the 2015 Rule, which involves entering SSNs into a database to

3    check for covered borrower status, does not parallel the

4    situations presented in <u>Joliet Oil</u> and <u>Yeager</u>.  Each of those

5    cases involved the effectuation of emergency government actions

6    through private businesses where those businesses provided some

7    sort of necessity (gasoline, water) that the government aimed to

8    closely regulate and provide access to.  CAPA's inability to

9    present authority much more analogous to its situation in the

10   instant case leads this Court to conclude that CAPA is unlikely

11   to prevail on this claim.

12                    d.   <u>CAPA Is Not Likely to Succeed On the</u>
                          <u>Merits of Count 4</u>
13

14        Under Count 4, CAPA claims that the safe harbor provision

15   contravenes The Right to Financial Privacy Act ("RFPA") of 1978.

16   Compl. at 27.  The RFPA makes it unlawful for any government

17   authority "to have access to or obtain copies of, or the

18   information contained in the financial records of any customer

19   from a financial institution" unless certain conditions are met.

20   12 U.S.C. § 3402.  CAPA argues that pawnbrokers are "financial

21   institutions" for the purposes of the RFPA, Mot. at 16, and that

22   pawnbrokers choosing to avail themselves of the safe harbor—thus

23   collecting, maintaining, and disseminating personal information

24   like the name, birthday, and SSNs from every potential customer—

25   would be in violation of the RFPA.  Mot. at 16-17.  In support of

26   its argument, CAPA cites only Black's Law Dictionary, which

27   defines financial institution as "a business, organization, or

28   other entity that manages money, credit or capital, such as a

                                  17

1  bank, credit union, savings-and-loan association, securities

2  broker or dealer, pawnbroker, or investment company."  Rep. at 7.

3     Defendants argue that pawnbrokers do not fall within the

4  legal definition of a "financial institution."  Opp. at 16.  They

5  point to "the only court of appeals decision on point," which

6  squarely rejected CAPA's argument herein.  Id. (citing Winters v.

7  Bd. of Cty. Comm'rs, 4 F.3d 848 (10th Cir. 1993)).  Furthermore,

8  Defendants argue that the 2015 Rule does not authorize the

9  government to obtain customers' records; rather, the database is

10  a tool for the pawnbroker to use to check for a covered borrower

11  and does not send information collected by the pawnbroker to the

12  Department.  Opp. at 16–17.

13     Under the RFPA, a financial institution is defined as "any

14  office of a bank, savings bank, card issuer . . ., industrial

15  loan company, trust company, savings association, building and

16  loan, or homestead association (including cooperative banks),

17  credit union, or consumer finance institution[.]"  12 U.S.C.

18  § 3401.  Defendants are correct that the Winters court explicitly

19  found that pawnshops are not considered financial institutions

20  under the RFPA.  The recent inclusion of pawnbrokers in the MLA

21  regulations may cast some doubt on that conclusion.  Even so,

22  Defendants have the stronger argument that the safe harbor

23  provision does not involve the transfer of financial records from

24  pawnbrokers to a government authority and, therefore, does not

25  violate the RFPA.

26     //

27     //

28     //

1

2

                                  e.   <u>CAPA's Arguments On Counts 2, 3, and 4</u>
<u>Are Waived</u>

3

4

      Defendants argue that CAPA waived their equal protection,

5

Privacy Act, and RFPA claims because neither CAPA nor anyone else

6

raised these issues during the notice-and-comment rulemaking

7

process.  Opp. at 11.  CAPA does not assert that any such

8

arguments were presented to the Department during that period.

9

CAPA argues that "a failure to object during the rulemaking

10

process [cannot] waive unforeseen unconstitutional consequences

11

of a proposed rule for all of time."  Rep. at 2.  It cites <u>Wind</u>

12

<u>River Min. Corp. v. U.S.</u>, 946 F.2d 710 (9th Cir. 1991), for the

13

proposition that "an action challenging the constitutional or

14

statutory authority of an agency to promulgate a rule has no

15

statute of limitations."  <u>Id.</u>

16

      The Ninth Circuit has unequivocally held that, unless there

17

are exceptional circumstances, a party's failure to make an

18

argument before the administrative agency in notice-and-comment

19

on a proposed rule bars it from raising that argument on judicial

20

review.  <u>Universal Health Servs., Inc. v. Thompson</u>, 363 F.3d

21

1013, 1019 (9th Cir. 2004) (citing <u>Exxon Mobil Corp. v. EPA</u>, 217

22

F.3d 1246, 1249 (9th Cir. 2000)).  In so holding, the court noted

23

that its decision is "consistent with the decisions of every

24

other circuit to have addressed the issue of waiver in notice-and

-comment rulemaking."  <u>Id.</u> (collecting cases).

25

      The only authority CAPA cites to the contrary is <u>Wind River</u>.

26

Rep. at 2.  CAPA reads too much into that decision.  The <u>Wind</u>

27

<u>River</u> court dealt with a statute of limitations question, holding

28

that "a substantive challenge to an agency decision alleging lack
of agency authority may be brought within six years of the
agency's application of that decision to the specific
challenger." Wind River, 946 F.2d at 716.  Thus, Wind River
stands for the proposition that the statute of limitations to
challenge the agency's decision as exceeding constitutional or
statutory authority runs from the date of the adverse application
to that particular challenger, rather than from the date that the
agency's decision was first made (i.e. publication in the Federal
Register).  Id. at 15-16.  Wind River does not address the
question of issue waiver.

　　　This Court agrees with Defendants that the waiver rule
applies to CAPA's claims.  Although neither party could point the
Court to a completely analogous case, Ninth Circuit precedent
weighs in favor of application in these circumstances.  See
Universal Health Servs., 363 F.3d 1013 (9th Cir. 2004) (finding
the hospitals' arguments waived because they were not raised in
the annual notice-and-comment rulemakings); Exxon Mobil Corp v.
U.S. EPA, 217 F.3d 1246, 1249 (9th Cir. 2000) ("Petitioners have
waived their right to judicial review of these final two
arguments as they were not made before the administrative agency,
in the comment to the proposed rule, and there are no exceptional
circumstances warranting review."); see also Huntco at 32-33
(finding that Plaintiffs' arguments that the Department failed to
consider pawnshops an "affected business" in the Final Rule and
that the Department failed to consider the Final Rule's impact on
small businesses in different geographic locations were each
waived because they were not presented to the Department during

20

the rulemaking process).  The strongest authority supporting CAPA's contrary position is <u>Reid v. Engen</u> where the Ninth Circuit stated:

> We may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it.  This situation is typified by challenges to the constitutionality of a statute or challenges to the constitutionality of a regulation promulgated by the agency.

765 F.2d 1457, 1461 (9th Cir. 1985).  <u>Reid</u>, however, involved an enforcement action against the petitioner and her subsequent appeal from the Administrative Law Judge's ruling, not a facial challenge to a rule or regulation like CAPA's challenges in this case.  If an enforcement action or lawsuit is brought against a CAPA member they may have an opportunity to raise the claims asserted here.  But for the purposes of this action, the Court finds that CAPA's claims under Counts 2, 3, and 4 are waived unless CAPA can direct this Court to evidence that the Department had an opportunity to consider them.  <u>See</u> <u>Portland Gen. Elec. Co.</u> <u>v. Bonneville Power Admin.</u>, 501 F.3d 1009, 1024 (9th Cir. 2007) ("In general, we will not invoke the waiver rule in our review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue.").

> 2.    <u>Likelihood Of Irreparable Harm</u>

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." <u>Alliance for the Wild Rockies v.</u> <u>Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011).  "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

1   injury as a prerequisite to preliminary injunctive relief."

2   Caribbean Marine Serv. Co., Inc. v. Baldrige, 844 F.2d 668 (9th

3   Cir. 1988).  "[M]onetary injury [from lost revenues] is not

4   normally considered irreparable."  Los Angeles Memorial Coliseum

5   Commission v. National Football League, 634 F.2d 1197, 1202 (9th

6   Cir. 1980).  A court may also consider timing; a delay in seeking

7   a preliminary injunction "implies a lack of urgency and

8   irreparable harm."  Oakland Trubune, Inc. v. Chronicle Pub. Co.,

9   Inc., 762 F.2d 1374, 1377 (9th Cir. 1985).

10      CAPA has an uphill battle because it waited until September

11  16, 2016, to file its Ex Parte Motion for Temporary Restraining

12  Order (here considered as a Motion for Preliminary Injunction)

13  even though the 2015 Rule was published on July 22, 2015.  ECF

14  No. 11; 2015 Rule, 80 Fed. Reg. 43560.  Over a year passed

15  between publication and the October 3, 2016 compliance date.

16  Furthermore, the Proposed Rule, which included the new definition

17  of consumer credit and the new safe harbor provision, was

18  published on September 29, 2014, giving affected parties an

19  additional nine months' notice.  Limitations on Terms of Consumer

20  Credit Extended to Service Members and Dependents, 79 Fed. Reg.

21  58602 (Sep. 29, 2014) (proposed rule).  Just as the delay

22  justified this Court's denial of TRO, it weakens CAPA's

23  irreparable harm argument here.

24      CAPA alleges that its members will suffer irreparable harm

25  because they will lose business due to having to use the safe

26  harbor, will suffer a constitutional equal protection violation,

27  and will face criminal and civil penalties either under Federal

28  or California law.  Mot. at 18-19.  CAPA argues that "California

                                    22

1  pawnbrokers are going to face substantial business losses due to

2  having to utilize the 'safe harbor' and necessarily deny loans to

3  individuals without Social Security numbers."  Mot. at 19.  It

4  offers several declarations in support of these contentions.

5  Declaration of Israel Adato ("Adato Decl."), ECF No. 11-2;

6  Declaration of Pat Rogers ("Rogers Decl."), ECF No. 11-5;

7  Declaration of Tony DeMarco ("DeMarco Decl."), ECF No. 11-6;

8  Declaration of Stan Lukowicz ("Lukowicz Decl."), ECF No. 11-7.

9  These declarations suggest that pawnbrokers will feel compelled

10 to use the safe harbor to protect themselves from liability under

11 the MLA and will have to turn away customers who are unable to

12 provide SSNs.  Mot. at 19.  For example, Israel Adato states that

13 he owns pawnshops near the Mexico border and estimates that 40-

14 50% of his loans are issued to immigrants.  Adato Decl. at ¶¶ 6,

15 11.  Adato declares that he will avail himself of the safe harbor

16 provision of the 2015 Rule in order to avoid liability under the

17 MLA and will decline to offer loans to immigrants and foreign

18 nationals who do not have SSNs, thus causing him to lose half of

19 his business and close some or all of his stores.  Id. at ¶¶ 12-

20 14.  Adato also fears suit under California's Unruh Act.  The

21 other three declarations make similar claims regarding lost

22 business and their intent to make use of the safe harbor

23 provision.  See Rogers Decl., DeMarco Decl., & Lukowicz Decl.

24 Additionally, two of the declarations allege that many of their

25 customers (25% to 33%) will not be willing to provide their SSNs

26 for fear of identity theft.  See Rogers Decl. at ¶ 7; Lukowicz

27 Decl. at ¶ 7.

28         Defendants argue that the harm CAPA alleges is not

1    irreparable because use of the safe harbor is not mandatory; CAPA

2    members are free to use other means to reduce the risk of lending

3    to a covered borrower.  Opp. at 19-20.  Defendants contend that

4    the argument regarding business losses in pawnshops serving many

5    immigrants and foreign nationals should fail because such

6    individuals are highly unlikely to be covered borrowers;

7    pawnbrokers can assess this risk by looking at the identification

8    each borrower already presents pursuant to state law.  Opp. at

9    20-21.  Defendants argue that pawnbrokers are still free to

10   verbally confirm or use a check box on a loan application to

11   determine whether an applicant is a covered borrower and that

12   business loss is not necessary.  Opp. at 21.  Furthermore,

13   Defendants point out that pawnbrokers only risk committing a

14   misdemeanor if they "knowingly" violate the statute.  Opp. at 22

15   (citing 10 U.S.C. § 987(f)(1)).  As for civil liability, the MLA

16   provides a defense for unintentional violations that "result from

17   a bona fide error notwithstanding the maintenance of procedures

18   reasonably adapted to avoid any such error."  Id. at 22-23

19   (citing 10 U.S.C. § 987(f)(5)(D)).  Finally, Defendants argue

20   that CAPA's equal protection allegations do not constitute

21   irreparable harm because where plaintiffs fail to demonstrate a

22   sufficient likelihood of success on the merits of their

23   constitutional claims, the presumption of irreparable harm is

24   inapposite.  Id. at 23.

25        The Huntco court decided that the Huntco plaintiffs would

26   not suffer irreparable harm due to the safe harbor provision

27   because the plaintiffs' arguments were "based on the false

28   premise that the Final Rule requires creditors to search the MLA

                                    24

Database." <u>Huntco</u> at 45.  It further asserted that "there are a number of other ways to lessen th[e] risk, if not eliminate it altogether, without using a covered borrower check, such as continuing to use self-certifications." <u>Id.</u>  The court pointed to the "knowingly" standard for criminal penalties and the "bona fide error" defense for civil penalties.  <u>Id.</u>  The court also found that the plaintiffs failed to demonstrate certain economic harm and loss of customer goodwill.  <u>Huntco</u> at 46-47.

Irreparable injury due to lost business is not clear in this case.  Many of the declarants' concerns are speculative: customers not being willing to provide SSNs, lawsuits under the Unruh Civil Rights Act.  More importantly, the alleged harm would be due to the pawnbrokers' choice to only extend loans to borrowers willing to provide an SSN; the 2015 Rule does not require collection.  <u>See</u> <u>Citizens of the Ebey's Reserve for a Healthy, Safe, & Peaceful Env't v. U.S. Dept. of the Navy</u>, 122 F.Supp. 3d 1068 (W.D. Wash. 2015) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").  Although it is understandable that a shop owner would choose to collect SSNs from every customer out of an abundance of caution, the shop owner could mitigate its risk by utilizing other means of coverage assessment for those customers who do not wish to provide one.

On the question of potential liability, the <u>Huntco</u> court's analysis is instructive, but only to a certain extent.  As that court recognized, use of the safe harbor is not technically mandatory and the availability of other risk reduction methods

cuts against CAPA's concern that its members will face criminal
and civil liability.  Despite the protections against liability
built into the MLA, this Court remains concerned that the "bona
fide error" defense will not actually protect pawnbrokers from
civil liability where they use their own method to determine
covered borrower status.  The "bona fide error" defense, 10
U.S.C. § 987(f)(5)(D), reads:

> A person may not be held liable for civil liability
> under this paragraph if the person shows by a
> preponderance of evidence that the violation was not
> intentional and resulted from a bona fide error
> notwithstanding the maintenance of procedures
> reasonably adapted to avoid any such error.  <u>Examples
> of a bona fide error include clerical, calculation,
> computer malfunction and programming, and printing
> errors, except that an error of legal judgment with
> respect to a person's obligations under this section is
> not a bona fide error.</u>

(Emphasis added.)  Neither the <u>Huntco</u> court nor Defendants
address the final sentence of this subsection or explain how a
pawnbroker's use of a different covered borrower determination
method (i.e. self-certification) would qualify as a "bona fide
error."  It appears to this Court that a "bona fide error" would
be an inadvertent mistake—like punching in the wrong SSN or a
software malfunction—and may not offer much civil liability
protection.  Even so, CAPA members' potential civil liability
under the statute is not an imminent, irreparable harm warranting
preliminary injunctive relief.[3]

    On the equal protection challenge, CAPA is correct that an
_____

[3] For example, before a pawnbroker utilizing a self-certification
method would face civil liability it would have to extend a loan
to a covered borrower who lied about their covered borrower
status and that covered borrower would then have to file a
lawsuit against that pawnbroker.  CAPA has not demonstrated that
such an event is likely.

1    alleged constitutional infringement may constitute irreparable

2    harm.  See Goldies Bookstore, Inc. v. Super. Ct. of State of

3    Cal., 739 F.2d 466, 472 (9th Cir. 1984).  Where the

4    constitutional claim is tenuous, however, irreparable harm will

5    not be found likely to occur.  See id.  CAPA's equal protection

6    claim is unlikely to succeed on the merits.  Thus, CAPA members

7    are not likely to suffer constitutional harm constituting

8    irreparable injury.

9         Finally, CAPA contends that this Court must issue injunctive

10   relief for its Privacy Act claim because damages are not

11   available as a remedy under the legislative scheme.  Rep. at 8.

12   CAPA states: "injunctive relief is the necessary and proper

13   relief granted to citizens by the Privacy Act."  Id.  But CAPA

14   does not bring this suit on behalf of individuals who have been

15   denied a right due to their refusal to disclose a SSN.  In each

16   case CAPA cites, injunctive relief was awarded to an individual

17   where an authority required that individual to give their SSN in

18   order to receive a right or privilege.  Ingerman v. Del. River

19   Port Auth., 630 F. Supp. 2d 426 (D. N.J. 2009) (senior citizen

20   required to provide SSN for senior citizen discount program);

21   Stollenwerk v. Miller, No. Civ.A. 04-5510, 2006 WL 463393 (E.D.

22   Penn. Feb. 24, 2006) (Pennsylvania citizen required to provide an

23   SSN to buy a hand gun under state law); Pontbriand v. Sundlun,

24   699 A.2d 856 (R.I. 1997) (depositors whose names, SSNs, and

25   account balances were released to the media by the governor had

26   standing to sue for injunctive relief under the Privacy Act).

27   These cases do not support CAPA's argument that this Court must

28   award injunctive relief where business owners fear they may be

1 | held liable for violating the Privacy Act when they ask borrowers
2 | for their SSN to check their covered borrower status.
3 |     On the whole, CAPA's delay in bringing this action, the fact
4 | that CAPA members are not required to collect SSNs, and the fact
5 | that CAPA's constitutional claim is not likely to succeed on the
6 | merits weigh against a finding that irreparable harm is likely.
7 |
8 |                          III.   ORDER
9 |     For the reasons set forth above, the Court DENIES
10 | Plaintiff's Motion for Preliminary Injunction:
11 |     IT IS SO ORDERED.
12 |     Dated:  November 7, 2016
13 |
14 | JOHN A. MENDEZ,
                           UNITED STATES DISTRICT JUDGE
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |